# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WILLIAM T. HART | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | **00 C 3444** | **DATE** | MAY 30 , 2002 |
| **CASE TITLE** | **HENRY S. TRAUM v. THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, et al.** | | |

**MOTION:**  [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Motion [55-1] granted in part, denied in part. Motion [45-1] granted. Defendants Paul Revere Life Insurance Company and UnumProvident Corporation are dismissed from this action and the intentional interference with contract claim is dismissed. Motion [46-1] granted in part, denied in part. Plaintiff's prayer for statutory penalties under 215 ILCS 5/155 is dismissed and plaintiff's prayer for future damages is dismissed without prejudice. In open court on July 17, 2002 at 11:00 a.m., the remaining parties shall present an original and one copy of a final pretrial order in full compliance with Local Rule 16.1 and Local Rule Form 16.1.1.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |
| cw | courtroom deputy's initials |

**3** number of notices

MAY 31 2002 date docketed

docketing deputy initials

MAY 30 2002 date mailed notice

mgm mailing initials

Document Number

62

U.S. DISTRICT COURT
02 MAY 30 PH 3:03
FILED-EDIL TG
Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

MAY 3 1 2002

HENRY S. TRAUM,                    )
                                   )
              Plaintiff,           )
                                   )
       v.                          )      No. 00 C 3444
                                   )
THE EQUITABLE LIFE ASSURANCE       )
SOCIETY OF THE UNITED STATES,      )
et al.,                            )
                                   )
              Defendants.          )


## MEMORANDUM OPINION AND ORDER


        Plaintiff Henry Traum worked as a trader (market maker)

at the Chicago Board Options Exchange.  In April 1981, Traum

obtained a disability income policy (the "Policy") from defendant

The Equitable Life Assurance Society of the United States

("Equitable").  During relevant time periods, defendants The Paul

Revere Life Insurance Company ("Revere") and UnumProvident

Corporation ("Unum"), either directly or through predecessors or

affiliates, administered claims for Equitable.  Effective

October 1, 1993, plaintiff was found to be disabled from

performing his occupation based on depression.  Effective June 2,

1998, disability payments were discontinued on the ground that

plaintiff was again able to perform his occupation.  Plaintiff

brought the present lawsuit alleging a breach of contract by

Equitable in that plaintiff continued to qualify for benefits and also alleging that Equitable's termination of benefits was vexatious and unreasonable in violation of 215 ILCS 5/155. Revere's and Unum's conduct is claimed to be intentional interference with the contract between plaintiff and Equitable. Presently pending are defendants' motions for summary judgment.

## I.  SUMMARY JUDGMENT STANDARD AND EVIDENCE

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. _Schneiker v. Fortis Insurance Co._, 200 F.3d 1055, 1057 (7th Cir. 2000); _Baron v. City of Highland Park_, 195 F.3d 333, 337-38 (7th Cir. 1999).  The burden of establishing a lack of any genuine issue of material fact rests on the movant. _Wollin v. Gondert_, 192 F.3d 616, 621-22 (7th Cir. 1999); _Essex v. United Parcel Service, Inc._, 111 F.3d 1304, 1308 (7th Cir. 1997). The nonmovant, however, must make a showing sufficient to establish any essential element for which he will bear the burden of proof at trial. _Celotex Corp. v. Catrett_, 477 U.S. 317, 322 (1986); _Shank v. William R. Hague, Inc._, 192 F.3d 675, 681 (7th Cir. 1999); _Wintz v. Northrop Corp._, 110 F.3d 508, 512 (7th Cir. 1997).  The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. _Celotex_, 477 U.S. at 324.  Also, it is not sufficient to show

evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. See NLFC, Inc. v. Devcom Mid-America, Inc., 45 F.3d 231, 236 (7th Cir.), cert. denied, 515 U.S. 1104 (1995); Covalt v. Carey Canada, Inc., 950 F.2d 481, 485 (7th Cir. 1991); Collins v. Associated Pathologists, Ltd., 844 F.2d 473, 476-77 (7th Cir.), cert. denied, 488 U.S. 852 (1988). As the Seventh Circuit has summarized:

> The moving party bears the initial burden of directing the district court to the determinative issues and the available evidence that pertains to each. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); id. at 325 ("the burden on the moving party may be discharged by 'showing'-- that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case"). Then, with respect to issues that the non-moving party will bear the burden of proving at trial, the non-moving party must come forward with affidavits, depositions, answers to interrogatories or admissions and designate specific facts which establish that there is a genuine issue for trial. Id. at 324. The non-moving party cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue. Id. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on

> which the jury could reasonably find for
> the[non-moving party]." <u>Anderson v. Liberty</u>
> <u>Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).

<u>Selan v. Kiley</u>, 969 F.2d 560, 564 (7th Cir. 1992).

Pursuant to Local Rule 56.1(a)(3), the party moving for summary judgment is required to provide a statement of material facts as to which the moving party contends there is no genuine issue. The statement is to be in the form of numbered paragraphs. The nonmovant is to reply to each paragraph, either admitting it is uncontested or stating the nonmovant's disagreement and specifically citing to supporting materials showing there is a genuine factual dispute. Loc. R. 56.1(b)(3)(A). The nonmovant is also to provide a statement of additional facts, if any, that would defeat summary judgment, again in the form of numbered paragraphs with supporting citations. Loc. R. 56.1(b)(3)(B). The moving party may provide a paragraph by paragraph reply to any additional facts submitted by the nonmovant. Loc. R. 56.1(a) (last paragraph). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." Loc. R. 56.1(b)(3)(B). Similarly, all material facts in the nonmovant's Rule 56.1(b)(3)(B) statement "will be deemed admitted unless controverted by the [reply] statement of the moving party." Loc. R. 56.1(a) (last paragraph). Expressing disagreement with a fact contained in the statement of one's opponent without providing a

citation to materials supporting that dispute is also a basis for deeming the factual assertions to be true. <u>Garrison v. Burke</u>, 165 F.3d 565, 567 (7th Cir. 1999); <u>Valenti v. Qualex, Inc.</u>, 970 F.2d 363, 369 (7th Cir. 1992); <u>Skagen v. Sears, Roebuck & Co.</u>, 910 F.2d 1498, 1500 (7th Cir. 1990). While the district court is permitted to require strict compliance with all the requirements of Local Rule 56.1, strict enforcement is not mandatory. Instead, it is within the court's discretion as to how strictly to apply its own rules. <u>Bordelon v. Chicago School Reform Board of Trustees</u>, 233 F.3d 524, 527 (7th Cir. 2000); <u>Dade v. Sherwin-Williams Co.</u>, 128 F.3d 1135, 1140 (7th Cir. 1997); <u>Weeks v. Samsung Heavy Industries Co.</u>, 126 F.3d 926, 938 n.5 (7th Cir. 1997); <u>Midwest Imports, Ltd. v. Coval</u>, 71 F.3d 1311, 1316-17 (7th Cir. 1995); <u>Schulz v. Serfilco, Ltd.</u>, 965 F.2d 516, 519 (7th Cir. 1992); <u>Tan v. City of Chicago</u>, 2001 WL 1012586 *3 (N.D. Ill. Aug. 30, 2001); <u>Ogborn v. United Food and Commercial Workers, Local No. 881</u>, 2000 WL 1409855 *2 (N.D. Ill. Sept. 25, 2000); <u>Gabriel v. City of Chicago</u>, 9 F. Supp. 2d 974, 975 n.2 (N.D. Ill. 1998); <u>United States v. 47 West 644 Route 38, Maple Park, Ill.</u>, 962 F. Supp. 1081, 1084 n.2 (N.D. Ill. 1997).

In responding to defendants' 116-paragraph Rule 56.1(a)(3) statement, plaintiff expressly admits all but 16 of those paragraphs are true. As to the other 16, plaintiff responds that they are unsupported by admissible evidence, contending the cited support is inadmissible hearsay. Plaintiff does not cite to evidence disputing these factual contentions.

Plaintiff's Rule 56.1(b)(3)(B) statement, though, is supported by citations to the record. Defendants contend the 16 disputed paragraphs should be deemed admitted because plaintiff does not specifically respond by citing to evidence supporting a genuine factual dispute. Alternatively, defendants contend the evidence they rely upon is admissible.

Defendants must support their asserted facts with citations to evidence that is admissible for summary judgment purposes. To the extent they fail to do so, plaintiff need only point that out; he need not provide his own contrary evidence--except to the extent that he otherwise has the burden to provide evidence supporting an essential element of a claim he makes. See Sanders v. International Union of Operating Engineers, Local 150, 2000 WL 283106 *4 (N.D. Ill. March 8, 2000), aff'd by unpublished order, 2001 WL 436189 (7th Cir. April 26, 2001); Smith v. Gildea, 1998 WL 703677 *6 (N.D. Ill. Sept. 30, 1998); Wagner v. Kester Solder Co., 1995 WL 399484 *4 (N.D. Ill. June 28, 1995); Hill v. Burrell Communications Group, Inc., 1994 WL 583296 *2-3 (N.D. Ill. Oct. 20, 1994), modified in part on other grounds, 1995 WL 76881 (N.D. Ill. Feb. 17, 1995), aff'd, 67 F.3d 665 (7th Cir. 1995).

Plaintiff objects to materials contained in his claim file, apparently contending the file has not been authenticated and, even if it has been, the contents are inadmissible hearsay. Defendants contend the documents are admissible as business records. Plaintiff's implication that the documents have not

been authenticated is disingenuous. The documents were provided during discovery and defendants' appendix of exhibits specifically cites to and includes the Rule 30(b)(6) deposition testimony that authenticates the documents. Defendants' Exhibit F is accepted as an authentic copy of plaintiff's claim file. The file was kept as part of a regularly conducted business activity.

The file is admissible as a business record. See Fed. R. Evid. 803(6). However, that does not make every aspect of the file available for all purposes. To the extent the file is cited to show what information was before defendants or that defendants took certain action as to the claim, it is certainly admissible because it is not being used to show the truth of the matter contained therein or because it is showing defendants' own conduct through their own business records. See United States v. Hershenow, 680 F.2d 847, 861 n.12 (1st Cir. 1982); United States v. Universal Rehabilitation Services, Inc., 1996 WL 297575 *12 (E.D. Pa. May 31, 1996), aff'd, 205 F.3d 657 (3d Cir. 2000). However, to the extent defendants rely on third party statements or documents to show the truth of the matters contained therein, such evidence is not admissible unless an additional basis for admission exists. Woods v. City of Chicago, 234 F.3d 979, 986 (7th Cir. 2000), cert. denied, 122 S. Ct. 354 (2001); Datamatic Services, Inc. v. United States, 909 F.2d 1029, 1033 (7th Cir. 1990); Johnson v. Herman, 132 F. Supp. 2d 1130, 1133 (N.D. Ind. 2001); State Farm Mutual Automobile Insurance Co. v. Abrams, 2000

WL 574466 *3-4 (N.D. Ill. May 11, 2000); <u>Jones v. Board of</u>
<u>Trustees of Community College District No. 508</u>, 75 F. Supp. 2d
885, 889 (N.D. Ill. 1999). One possibility is that the evidence
would be admissible under another hearsay exception. <u>See United</u>
<u>States v. Emenogha</u>, 1 F.3d 473, 483-84 (7th Cir. 1993), <u>cert.</u>
<u>denied</u>, 510 U.S. 1080 (1994); <u>Datamatic</u>, 909 F.2d at 1133; <u>Abrams</u>,
2000 WL 574466 at *3. Another possibility is that the third-party
statement or document will have adequate sources of corroboration
to deem it admissible.[1] <u>See</u> <u>Emenogha</u>, 1 F.3d at 484; <u>United</u>
<u>States v. Vigneau</u>, 187 F.3d 70, 77 & n.6 (1st Cir. 1999), <u>cert.</u>
<u>denied</u>, 528 U.S. 1172 (2000). <u>See also</u> <u>United States v. Sokolow</u>,
91 F.3d 396, 403 (3d Cir. 1996), <u>cert. denied</u>, 519 U.S. 1116
(1997) (quoting <u>United States v. McIntyre</u>, 997 F.2d 687, 700 (10th
Cir. 1993), <u>cert. denied</u>, 510 U.S. 1063 (1994)) ("if the business
entity has adequate verification or other assurance of accuracy of
the information provided by the outside person").

Many of the objected to fact statements contain
evaluations by defendants' own agents, representatives, or
in-house consultants. These are not statements or documents of
third parties and are properly considered as business records,
not just to show actions taken by defendants or information

---

[1]Courts "have generally held that a document prepared by
a third party is properly admitted as part of the business record
entity's records if the business integrated the document into its
records and relied upon it." <u>Air Land Forwarders, Inc. v. United</u>
<u>States</u>, 172 F.3d 1338, 1342-43 (Fed. Cir. 1999) (collecting
cases). <u>See also</u> <u>Jones</u>, 75 F. Supp. 2d at 889. In <u>Woods</u> and
<u>Datamatic</u>, the Seventh Circuit appears to have held otherwise.

before defendants, but also as proof of medical determinations made by the consultants. To the extent any of the business records relied upon by defendants are from outside doctors, those doctors' medical reports must be adequately authenticated. See Renaldi v. Sears Roebuck & Co., 2001 WL 290374 *7 (N.D. Ill. March 21, 2001); Russell v. Mounsey, 1998 WL 456434 *1 (N.D. Ind. April 24, 1998); Burrell v. Fairman, 1992 WL 233909 *1 (N.D. Ill. Sept. 15, 1992). Plaintiff also objects to statements attributed to him that are contained in his claim file. The claim file is admissible evidence to show he made the statements to defendants' employees and the statements are thus admissible as admissions of a party opponent. See Fed. R. Civ. P. 801(d)(2); Emenogha, 1 F.3d at 484; EEOC v. SWP, Inc., 153 F. Supp. 2d 911, 914 n.1 (N.D. Ind. 2001).

## II. SUMMARY JUDGMENT FACTS

The aforestated principles will be applied in determining the facts that are deemed to be true for purposes of ruling on defendants' motions for summary judgment. In general, plaintiff's objections are without merit. Additionally, although plaintiff does not specifically cite to contrary evidence in his objections to defendants' fact statements, to the extent plaintiff's statement of additional facts contains adequately supported contrary facts, a genuine factual dispute will be found to exist. Drawing all reasonable inferences and resolving all genuine factual disputes in plaintiff's favor, the facts assumed

to be true for purposes of defendants' motions for summary
judgment are as follows.

On April 15, 1981, Equitable issued the Policy to
plaintiff, who was born in 1948.  The Policy provides a lifetime
monthly payment if, prior to age 50, plaintiff has a total
disability resulting from sickness.  Under the Policy, "Total
disability means the inability of the Insured, because of injury
or sickness, to engage in the Insured's regular occupation,
provided, however, that the total disability will not be
considered to exist for any period during which the Insured is
not under the regular care and attendance of a physician except
in cases of presumptive total disability."  On his application
for insurance, plaintiff listed his occupation as "market maker,"
and that apparently continued to be his occupation until he
applied for disability.  On his initial claim for disability
benefits, plaintiff identifies his occupation as "trader," but
includes setting market prices as one of his activities.  The
other listed activities are analysis of markets/risk; determine
whether buying or selling; initiate trades for my own account;
monitor positions; and exit transactions.  On his initial claim
form, plaintiff claimed that stress prevented him from performing
all these tasks except the analysis and monitoring.

On September 13, 1993, plaintiff submitted an initial
claim for disability benefits accompanied by a statement from
attending physician Thomas Stern, M.D., an internist, diagnosing
major depression and obsessive compulsive disorder beginning

September 1, 1993. Stern stated that with "a good response to therapy and medication, [plaintiff] could potentially return to previous work in 6 months." Following receipt of an authorization from plaintiff, on October 21, 1993, Equitable[2] requested that Dr. Stern complete a psychiatric assessment form. The next day, before receiving the assessment, Equitable issued the initial benefit payment for the month commencing October 1.

Dr. Stern submitted an assessment dated November 16, 1993. He opined that plaintiff was totally disabled from his occupation, but that plaintiff could work part-time in any other job immediately, and part-time in his occupation beginning January 1, 1994. Dr. Stern indicated plaintiff's response to prescribed medication was "good so far" and that his response to treatment was "progressive but slow improvement."

On December 10, 1993, "Christy" in the Claims Department asked in-house medical consultant Dr. Berc whether an independent medical examination ("IME") was advisable. On December 16, 1993, Dr. Berc responded that an IME, including psychological testing, should be performed to clarify cognitive processes. Under the terms of the Policy, Equitable could, within reason, require IME's when and as often as it desired.

Plaintiff was referred to psychiatrist James Patras for an IME. On February 17, 1994, Dr. Patras examined plaintiff and

---

[2]In reciting the history of plaintiff's claim, conduct will generally be referred to as being taken by Equitable or an Equitable employee regardless of whether it was actually action taken by Revere as Equitable's agent.

thereafter issued a report dated March 7, 1994. As part of this examination, clinical psychologist Peter Newman, Ph.D., performed a neuropsychological examination. Newman found that plaintiff had major depression, presented a risk of suicide, and that the disability claim appeared to be valid. It was Dr. Patras's opinion that plaintiff was totally disabled, including unable to perform his duties as a trader. He also reported that it was possible that, with regular treatment by a psychiatrist, plaintiff's condition could improve to the point that he could return to his regular occupation.

On February 25, 1994, Equitable advised plaintiff that, under the terms of the Policy, he was not required to pay premiums while disabled. It refunded some premiums that had been paid during the period of disability.

In a memorandum dated April 5, 1994, Dr. Berc stated the reports of Dr. Patras and Newman lacked the detail necessary to conclude that plaintiff was disabled. He recommended that more detailed examinations and reports be obtained. In a June 24, 1994 memorandum to the Claims Department, psychologist David McDowell, Ph.D., an in-house consultant, questioned the adequacy of conclusions reached by Patras and Newman, as well as internist Stern's qualifications to diagnose and evaluate psychiatric disorders. McDowell recommended rehabilitative services designed to return plaintiff to work and an IME by a rehabilitative or disability specialist if the rehabilitative services were not likely to be effective.

In early August 1994, Equitable Field Representative Steve Page interviewed plaintiff and also obtained information from Dr. Stern. Plaintiff told Page that his condition continued to improve and that he was feeling much better. Plaintiff also stated that he was taken off anti-depressant medication in July and that it was hoped he would improve without a need for medication. Plaintiff expressed the opinion that treatment by a psychologist[3] and internist was sufficient, that he did not need to see a psychiatrist. Plaintiff also stated that he did not expect to return to being a trader because the stress might cause his health to deteriorate.

On April 12, 1995, a Claims Department employee spoke to plaintiff about rehabilitative services. Plaintiff said "not now" and otherwise indicated a lack of interest in partaking in rehabilitative services at that time.

During the time that plaintiff received disability payments, he submitted monthly progress reports to Equitable. Prior to February 1998, Dr. Stern completed the attending physician portion of the reports. For the last four reports, February through May 1998, psychologist Greene was the attending physician. In two of those reports, Greene recommended that plaintiff not return to his occupation of trader.

According to a report of Field Representative Alice Mead, R.N., B.S.N., C.C.M., she interviewed Dr. Stern on October 7,

---

[3]In 1989 or 1990, plaintiff began seeing psychologist Gerald Greene, Ph.D., for the treatment of depression.

1997 and he reported that plaintiff was not then taking any medications and that his limitations were "subjective not objective."[4]  Later in October, Mead also interviewed Greene. Thereafter, Mead issued a report dated November 4, 1997 in which she recommended that Equitable "may wish" to schedule an IME with a psychiatrist with expertise in treating patients in high-stress occupations in order to determine if plaintiff could return to his occupation on a full- or part-time basis.

On January 16, 1998, Field Representative Page met with plaintiff at plaintiff's residence.  Plaintiff stated that he continued to see Dr. Stern once a month, primarily to complete the progress report.  He also stated that he was not on any psychiatric medications and that he could not go back to work as a trader.  He stated that he did not look for other work because it would likely pay less than he earned as a trader and he did not want to jeopardize the benefits he was receiving.  In his report, Page recommended that an IME be conducted to determine what is precluding plaintiff from returning to work.

On April 17, 1998, clinical psychologist Michael Kovar, Ph.D., conducted an IME and thereafter issued a report dated May 6, 1998.  Kovar was not provided with records of plaintiff's prior examinations.  Also, he limited his testing to the two

---

[4]Since defendants point to no corroboration or verification for the "subjective not objective" statement, it is only considered as to information in the claims file, not for the truth of the matter.  There is corroborative evidence of the no medications statement.

tests requested by Equitable, a brief mental status examination and the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"). Kovar did not administer the Beck Depression Inventory, Digital Symbol Subtest of the WAIS-R, Finger Tapping Test, or Hamilton Rating Scale because Equitable did not request those tests.[5] Kovar interviewed plaintiff for about 50 minutes and spent another hour and a quarter administering the MMPI-2. In his report, Kovar states that plaintiff "seems to have a fairly low competitive drive at present, which most likely reflects a change in lifestyle rather than a depressive manifestation." He also states: "Diagnostic impressions are of Narcissistic Personality Features, with possible mild depression." Kovar did not provide any express opinion regarding plaintiff's ability to return to work. At his deposition, Kovar testified that plaintiff was close to abnormal on an MMPI-2 scale related to depression. Kovar also testified that a reduced anxiety level shown on the MMPI-2 could be in part because plaintiff had not worked as a market maker for five years and had been in therapy.

Henry Conroe, M.D., is board certified in psychiatry and forensic psychiatry. He conducted an IME on March 18, 1998 and thereafter issued a report dated May 11, 1998. Dr. Conroe met with plaintiff for 1.75 hours. He had medical records from

---

[5]While plaintiff points to testimony that Kovar did not conduct these tests, he does not point to evidence of what these tests may have shown at that time nor evidence that they were tests that ordinarily would have been administered in determining his condition.

plaintiff's treating doctors and Kovar's report, but he did not

have the prior IME report.[6] Dr. Conroe states in his report:

> . . . Mr. Traum has the following psychiatric
> diagnoses: Axis I:  Major Depressive Disorder,
> Single Episode in Full Remission; Axis II:
> Personality Disorder, Not Otherwise Specified
> with Narcissistic and Obsessive-Compulsive
> Features; Axis III:  None established; Axis IV:
> Marital and family problems; Axis V:  Current
> GAF:  75, Highest in Past 12 months:  75.  There
> is no indication of significant ongoing disabling
> anxiety or depression.  My impressions are
> consistent with Dr. Kovar's testing.  The
> "possible mild depression" that Dr. Kovar noted
> appears associated with his personality disorder
> and is not evident as a significant factor in his
> daily functioning. . . .  The Post-traumatic
> Stress Disorder cited by Dr. Greene or the
> "anxiety/depression as before" mentioned by Dr.
> Stern as the nature of his sickness are not
> supported by the evidence in his insurance file
> or by my evaluation of Dr. Kovar's.  Mr. Traum
> has fully recovered from the initial Major
> Depressive Episode and has not required
> antidepressants for almost 4 years. . . .  I
> don't see additional mental health treatment as
> being needed to achieve the goal of a return to a
> pre-disability level of functioning.  In my
> opinion, the claimant's continuing claim for
> disability is not based on the presence of a
> disabling mental disorder but rather is due to
> dissatisfaction with his past work, feelings of
> entitlement, his adjusting to the role of living
> a slower paced life and a lack of motivation to
> return to work.  In conclusion, Mr. Traum does
> not experience current psychiatric symptomatology
> that would prevent him from performing the duties
> of his occupation as an Independent Trader in the
> stock/bond markets.

---

[6]At his deposition, Dr. Conroe could not recall the IME.
On defendants' motions, that testimony must be taken as true even
though other evidence indicates Dr. Conroe had the insurance file
which, if complete, would have included the prior IME.

At his deposition, Dr. Conroe testified that plaintiff would have been able to return to work in March 1994, which is contrary to Dr. Patras's 1994 opinion.

The reports of Dr. Conroe and Kovar were reviewed by defendants' in-house consultants. This was a recent change from past practices when independent consultants had greater responsibility for making the final decision.[7] John Kraft[8] found Dr. Conroe's report "to be specific, succinct and relevant" and summarized that "Dr. Conroe does not find symptomatology that would prevent Mr. Traum from performing the duties of his occupation as an Independent Trader in the stock/bond markets." Psychiatrist Marcia Scott, M.D., states:

> Based on the documentation in Dr. Conroe's IME review of documents and examination I concur that the insured may initially have become depressed but has recovered from any initial mental disorder or impairment and is currently able to function at his pre-disability level. There is no documentation in the examination or testing report that would indicate a diagnosis of PTSD.
> The testing and interview by Dr. Kovar documents that the insured has no current mental impairment and his personality functioning now is

---

[7]In this situation, it apparently would not have made a difference since Dr. Conroe found plaintiff could return to his past work and although Kovar made no express finding as to that specific issue, his findings implied the same.

[8]Without objection, defendants refer to Kraft as being a "psychiatric consultant." Kraft is a social worker, identifying himself as ACSW (Academy of Certified Social Workers) and LICSW (Licensed Independent Clinical Social Worker). Kraft was also the one who selected Kovar and Conroe as the practitioners to perform the IME's.

consistent with his usual, pre-disability
personality functioning.

In a letter dated June 17, 1998, Equitable informed
plaintiff that, following the IME's and evaluation of his claim
file, his disability benefits were being terminated effective
June 2, 1998.  Plaintiff was also advised that he would have to
begin paying premiums again if he wished to continue to have
coverage.

After the June 1998 denial letter, plaintiff sought
reconsideration on at least three occasions, all of which were
denied.  The denials of reconsideration were contained in letters
dated July 2, 1998, August 26, 1998, and November 18, 1999.

Beginning October 21, 1998, plaintiff saw Terry L.
Hanusa, M.D.  Dr. Hanusa apparently is a psychiatrist and
plaintiff also saw a clinical social worker in Dr. Hanusa's
practice.  In a three-paragraph letter dated March 3, 1999
addressed "To Whom It May Concern," Dr. Hanusa opined that
plaintiff then had anxiety and major depression and some symptoms
of post-traumatic stress disorder.  He further opined that
plaintiff was not capable of continuing his profession as a floor
trader.  Plaintiff's attorney sent this letter to Equitable on
March 15, 1999.

Equitable had another consulting psychiatrist, Andrew
Brown, M.D., review the file, including Dr. Hanusa's letter.  In
a report dated October 29, 1999, Dr. Brown stated that the
material submitted by Dr. Hanusa does not contribute significant

additional insight into plaintiff's impairment. Dr. Brown
concluded that the additional information did not undermine the
conclusions of Dr. Conroe. In contrast with Dr. Conroe's
detailed review and analysis, Dr. Brown characterized "the value
of Dr. Hanusa's information" as "sharply limited by its brevity,
its narrow scope, and by the dearth of evidence from which its
conclusions derive."

The November 18, 1999 denial of reconsideration was based
on the entire claim file, including Dr. Hanusa's submission and
Dr. Brown's report. In making both the initial denial and the
denials of reconsideration, Equitable relied on plaintiff's
description of his job duties as contained in plaintiff's claim
for benefits. No person at Equitable independently investigated
plaintiff's job duties nor had a detailed understanding of the
duties.

On January 16, 2001, psychiatrist Mark Mills, J.D., M.D.,
met with plaintiff for five hours and performed an evaluation.
Dr. Mills is plaintiff's retained expert. Dr. Mills classified
plaintiff's stress and anxiety as "clinically significant and
disabling" and recommended that plaintiff not return to his
occupation. As of April 2001, plaintiff was seeing Greene once a
month. Plaintiff has not seen Dr. Stern since 1999.

Since prior to 1993, defendant Revere has been a wholly-
owned subsidiary of The Paul Revere Corporation. In 1997,
Provident Companies, Inc. acquired the stock of The Paul Revere
Corporation, thereby making defendant Revere an indirect wholly-

owned subsidiary of Provident Companies, Inc.  On June 30, 1999,
Unum Corporation merged into Provident Companies, Inc. and
Provident Companies, Inc. renamed itself as defendant
UnumProvident Corporation ("Unum").  Unum is a holding company
and does not underwrite or market any insurance or financial
products.  Revere is authorized to do business as an insurance
company.  Defendant Unum did not assume the liability for claims
maintained against defendant Revere.

In June 1993, Equitable and Revere entered into an
"Administrative and Marketing Agreement" (the "Agreement") under
which Revere has provided claims management services for
Equitable.  Section 2.2(a) of the Agreement defines claims
management services as meaning

> (i) complete claim adjudication services
> including, but not limited to, investigation and
> acceptance and denial of claims and preparation
> and delivery of checks; (ii) use of Paul Revere's
> computer systems and data processing capabilities
> for the adjudication and payment of claims and
> maintenance of appropriate records, (iii) payment
> of claims on policies in accordance with the
> terms and conditions of the policy, taking into
> account any authorized sales materials delivered
> to the policyholder, (iv) management of claims
> consistent with The Equitable's current claims
> management practices, as modified in accordance
> with Section 2.2(b), and (v) compliance with all
> tax reporting and withholding requirements.

Section 2.2(b) of the Agreement also provides that
"Equitable shall retain final authority as to the payment of a
claim on a policy in accordance with the terms and conditions
thereof."  Personnel employed by Equitable consulted on claims

being administered for Equitable by Revere, for quality assurance
purposes, that is to ensure fair and appropriate management of
the claims.  Revere claims examiners did not handle claims on
Equitable policies any differently than claims on Revere's own
policies.  Some of the employees that were acting on behalf of
Revere in processing Equitable claims, including plaintiff's
claim, were actually employees of Provident Companies, Inc. and,
following the merger, employees of Unum.

### III.  MERITS

Equitable's motion is for partial summary judgment.
Equitable does not contend it is entitled to summary judgment on
the issue of whether plaintiff could perform his past occupation
after June 2, 1998.  However, it contends that undisputed facts
show that plaintiff could not qualify for benefits after 1999
because he was no longer under the care of a physician.
Alternatively, Equitable contends that, as a matter of law,
damages for plaintiff's contract claim are limited to those
existing at the time of judgment, that no future damages may be
awarded.  Equitable also contends that the undisputed facts show
that its conduct is not of the type that violates 215 ILCS 5/155.

### A.  Regular Care and Attendance

The Policy's definition of total disability excludes any
period during which "the Insured is not under the regular care
and attendance of a physician."  Equitable contends there is

inadequate proof that plaintiff was under the regular care and attendance of psychologist[9] Greene at any time after 1999.

"'Illinois courts apply the rule that any ambiguities in the provisions of an insurance policy will be construed against the drafter of the instrument, the insurer, and in favor of the insured.' Heller v. Equitable Life Assurance Society of United States, 833 F.2d 1253, 1256 (7th Cir. 1987). Further, 'provisions that limit or exclude coverage are to be construed liberally in favor of the insured and most strongly against the insurer.' National Union Fire Insurance Co. v. Glenview Park District, 158 Ill. 2d 116, 632 N.E.2d 1039, 1042 (1994)." Smith v. Equitable Life Assurance Society of United States, 67 F.3d 611, 617 (7th Cir. 1995). "However, 'where . . . there is no ambiguity, [the courts] will not ignore the very plain language of the policy.'" Heller, 833 F.2d at 1256 (quoting Rock Island Bank v. Time Insurance Co., 57 Ill. App. 3d 220, 372 N.E.2d 998, 999 (3d Dist. 1978)). The Seventh Circuit has held: "We are convinced that under Illinois law the clause 'under the regular care and attendance' means just what it says, namely, that the insured is obligated to periodically consult and be examined by his or her treating physician at intervals to be determined by the physician." Heller, 833 F.2d at 1257. In Lefebvre v. Ivex Packaging Corp., 1998 WL 325258 (N.D. Ill. June 11, 1998), the court construed the clause "requires the

---

[9]There is no contention that Greene is not a "physician" as that term is used in the Policy.

regular attendance of a physician" in an insurance policy's definition of disabled.

> . . . the "regular attendance of a physician" requirement does not mandate that plaintiff must visit his physician on a monthly basis. Instead, when defined according to its plain, ordinary and popular meaning, the term "attend" means "to take care or charge of" or "to serve as doctor to during an illness." Webster's New World Dictionary 89 (2nd ed. 1984). The term "regular" means "usual or customary." Id. at 1196. Thus, the regular attendance requirement means that the insured must be under the customary care of his doctor. Contrary to the defendants' assertions, the regular attendance requirement does not mean that one must habitually attend a physician's office. Rather, it is the physician who must attend to or care for the patient.

Id. at *7. See also May v. National Life Insurance Co., 1997 WL 461085 *5 (N.D. Ill. Aug. 8, 1997); Rahman v. Paul Revere Life Insurance Co., 684 F. Supp. 192, 198 (N.D. Ill. 1988).

At his deposition in April 2001, plaintiff testified that he had been seeing Greene continually since 1989, with a couple of short intervals when he was not seeing him. As of the time of the deposition, plaintiff was seeing Greene approximately once a month. Equitable contends this is inadequate to show that Greene was actually attending to or caring for plaintiff since plaintiff does not describe the meetings other than to say he was "seeing" Greene. As Equitable rhetorically asserts, that could mean plaintiff was seeing Greene at monthly poker games. However, it was Equitable's lawyer who injected the term "see" and "seeing" in his questioning and the questioning is clearly in the context

of seeing practitioners for treatment or examination. Moreover, on Equitable's summary judgment motion, all reasonable inferences must be drawn in plaintiff's favor. In light of other evidence that plaintiff had been seeing Greene for psychological treatment for years, it is certainly a reasonable inference (if not the only reasonable inference) that, as of 2001, plaintiff was still seeing Greene for treatment. Regular monthly visits would be sufficient to satisfy the requirement of regular care and attendance.

Equitable also contends that plaintiff's testimony should be excluded because of a ruling during discovery. During discovery, the court granted defendants' motion to compel Greene to respond to a subpoena for documents. After Greene failed to comply, a rule to show cause why Greene should not be held in contempt was entered. Greene did not thereafter appear and the following order was entered: "Dr. Gerald M. Greene did not appear in court [on] rule to show cause why he should not be held in contempt of court. The court declares Dr. Gerald M. Greene is in contempt of court. Dr. Greene is barred from participating and providing documents and evidence he may have in this case." Equitable contends this order should also bar plaintiff from testifying about Greene's treatment because Equitable was unable to obtain documents that may impeach plaintiff's testimony. Plaintiff, however, does not control Greene's conduct. Plaintiff cooperated in attempting to obtain Greene's compliance with the subpoena. At plaintiff's deposition, defendants could have

further questioned plaintiff about the treatment he received from Greene. Also, defendants rely upon documents of Greene that are contained in plaintiff's claim file even though the parties have not had access to other contemporary documents of Greene that may exist. Plaintiff's testimony as to his treatment by Greene will not be barred.

The post-1999 aspect of plaintiff's contract claim will not be dismissed based on the failure to be under the regular care and attendance of a physician.

### B.  Future Damages

Equitable contends that, absent repudiation, future monthly benefits should not be awarded if plaintiff succeeds in proving his claim. Plaintiff does not dispute that he would have to show a repudiation of the contract or an anticipatory breach as shown by a manifestation of Equitable's intent not to perform under the contract.[10] Plaintiff contends that one sentence in Equitable's June 17, 1998 letter of denial shows that intent. One paragraph of the letter states:

> Enclosed please find a check representing Total Disability Benefits to June 2, 1998, the date of our final review of your claim. Please be advised that your claim is now closed and no additional benefits will be forth coming. In order to keep your policy in force you should resume payment of your premium. [Emphasis added.]

---

[10]Plaintiff apparently also concedes that he would have to show that he will never be able to return to his occupation. That issue is not raised by Equitable's motion. However, plaintiff provides the evidence that Dr. Mills opined that he will never be able to return to his occupation.

Thereafter, however, Equitable continued to consider plaintiff's requests for reconsideration, including by obtaining the opinion of outside consultant Dr. Brown. Also, the letter itself advises plaintiff of the opportunity to keep his policy in force in the event of a future disability.

Anticipatory breach requires a "positive and unequivocal manifestation of a party's intent not to render the performance promised under the contract when the time fixed in the contract arrives." Bituminous Casualty Corp. v. Commercial Union Insurance Co., 273 Ill. App. 3d 923, 652 N.E.2d 1192, 1197 (1st Dist. 1995). Accord Coltec Industries, Inc. v. Zurich American Insurance Co., 2000 WL 1231553 *3 (N.D. Ill. Aug. 28, 2000); Carpo Service Centers, Inc. v. A.P. Parts International, Inc., 2000 WL 12720 *10 (N.D. Ill. Jan. 4, 2000). See also Shields Pork Plus, Inc. v. Swiss Valley Ag Service, ___ Ill. App. 3d ___, ___ N.E.2d ___, 2002 WL 595125 *9 (4th Dist. April 16, 2002) ("promisor's language must be sufficiently clear and distinct to be reasonably interpreted to mean that the promisor cannot or will not perform"). The June 17, 1998 letter does not manifest such an intent, especially in light of Equitable's willingness to reconsider its decision and to continue the policy.

Plaintiff has not shown an anticipatory breach of the contract that would support awarding future damages. Plaintiff's claim for future damages will be dismissed without prejudice to

moving to raise the issue at trial in the event of new conduct by
Equitable constituting an anticipatory breach.

### C. Statutory Penalty

Under Illinois insurance law, an insured can be awarded
attorney fees plus a penalty of up to $25,000 if there is
vexatious and unreasonable delay in paying a claim.  215 ILCS
5/155.

> Because this statute is "penal in nature" its
> provisions must be strictly construed.  Morris v.
> Auto-Owners Ins. Co., 239 Ill. App. 3d 500, 509,
> 180 Ill. Dec. 222, 606 N.E.2d 1299, 1305 (1993).
> Attorneys fees may not be awarded simply because
> an insurer takes an unsuccessful position in
> litigation, but only where the evidence shows
> that the insurer's behavior was willful and
> without reasonable cause.  Id.  This means that
> an insurer's conduct is not vexatious and
> unreasonable if:  (1) there is a bona fide
> dispute concerning the scope and application of
> insurance coverage, Green v. International Ins.
> Co., 238 Ill. App. 3d 929, 935, 179 Ill. Dec.
> 111, 605 N.E.2d 1125, 1129 (1992); (2) the
> insurer asserts a legitimate policy defense,
> Cummings Foods, Inc. v. Great Central Ins. Co.,
> 108 Ill. App. 3d 250, 259, 64 Ill. Dec. 108, 439
> N.E.2d 37, 44 (1982); (3) the claim presents a
> genuine legal or factual issue regarding
> coverage, Lazzara v. Esser, 622 F. Supp. 382, 386
> (N.D. Ill. 1985); or (4) the insurer takes a
> reasonable legal position on an unsettled issue
> of law.  Martz v. Union Labor Life Ins. Co., 573
> F. Supp. 580, 586 (N.D. Ill. 1983), rev'd on
> other grounds, 757 F.2d 135 (1985).

Citizens First National Bank of Princeton v. Cincinnati Insurance
Co., 200 F.3d 1102, 1110 (7th Cir. 2000).

Although not directly raised by the motions before the
court, the record indicates that a genuine factual dispute
continues to exist as to whether plaintiff continued to be

disabled after June 2, 1998. Greene, Dr. Hanusa, and Dr. Mills opined that plaintiff continues to be disabled whereas Kovar, Dr. Conroe, and Dr. Brown opined that plaintiff is not disabled. Plaintiff contends that the history of the claim shows that Equitable continually attempted to question or deny his disability claim.[11] However, the question is whether there has been vexatious and unreasonable delay. Equitable awarded disability benefits in 1993 and continued to pay the benefits until 1998. Therefore, any delay must occur after June 1998.[12] It must have been unreasonable and vexatious to discontinue benefits in June 1998 or to continue to deny benefits thereafter. Any consideration of discontinuing benefits at a time earlier than June 1998 which did not actually result in a discontinuation of benefits would not itself constitute a delay in paying benefits, though it could be evidence relevant to Equitable's intentions at a later date. Moreover, the record shows that

---

[11]Although, in 1994, a number of Equitable employees recommended further examination was necessary to consider whether plaintiff's claim was meritorious, no such action was taken at that time. It was not until 1997 that further action was taken to verify or refute plaintiff's disability. Also, it should be noted that Dr. Stern and Dr. Patras both suggested in 1993 and 1994 that plaintiff might eventually be able to return to his occupation.

[12]Plaintiff also complains that his initial payment, which was effective October 1, 1993, was not paid until October 22. It is too late to now seek a § 155 award based on that delay. In any event, that is not an unreasonable delay. The initial application was not submitted until September 13, 1993 and Equitable began paying benefits before a psychiatric assessment had been completed and received.

Equitable continued to pay the benefits for a number of years even though its Claims Department had serious questions as to whether plaintiff was actually disabled. Equitable did not discontinue benefits until it obtained two IME's strongly supporting discontinuation and, even after that, it obtained another consultant's opinion when plaintiff sought reconsideration.

Plaintiff questions whether the practitioners who performed the IME's were actually independent of Equitable and not predisposed toward evaluations going against awarding benefits. The practitioners, however, provided detailed reports and plaintiff generally does not attempt to refute the actual analysis in the reports. Plaintiff does suggest that Kovar should have performed additional tests, but plaintiff points to no expert testimony or other evidence that such tests were called for under the circumstance or that they would have produced results favorable to a finding of disability. There is no sufficient basis for reasonably inferring that Kovar and Dr. Conroe were not sufficiently independent.

Plaintiff also questions Equitable's references to plaintiff declining rehabilitative services. As plaintiff correctly points out, total disability under the Policy is defined as an inability to perform plaintiff's occupation. An ability to perform other occupations would not preclude a finding of total disability. However, a disinclination to perform other work might be an indication of malingering. In any event, the

record does not support an excessive focus on plaintiff's ability to perform other work nor was his ability to perform other work or his disinclination toward rehabilitative services a ground used for denying benefits.

Plaintiff also complains that Equitable did not adequately investigate or consider plaintiff's actual job duties. Equitable, however, relied on plaintiff's report of his duties. Also, plaintiff does not specifically complain that the practitioners performing the IME's were inadequately aware of his job duties nor does he point to a specific job duty that Equitable failed to take into consideration in making its determination.

The cases cited by plaintiff in which § 155 penalties were awarded are distinguishable from the present case. In Smith, Smith's attending physicians determined Smith was totally disabled and the insurer initially paid benefits. However, without having Smith examined further, the insurer discontinued benefits based on an evaluation of the medical records by an in-house medical expert.[13] Moreover, the insurer's medical expert was unaware that the applicable policy defined total disability as an inability of Smith to perform his occupation, not a general state of total disability. The insurer did not conduct a medical examination until two-and-one-half years after the initial application, two years after the discontinuation of

_____

[13]The insurer in the Smith case was Equitable and the in-house medical expert was Dr. Berc.

benefits, and eight months after the lawsuit was filed. <u>See</u>
<u>Smith</u>, 67 F.3d at 618. That situation is unlike the present
case where Equitable conducted a number of IME's prior to
discontinuing benefits, the later IME's did not support a finding
of a continued disability, and the medical consultants
specifically considered whether plaintiff could perform his
duties as a trader. In <u>Brennan v. Paul Revere Life Insurance</u>
<u>Co.</u>, 2002 WL 54558 (N.D. Ill. Jan. 15, 2002), an IME was obtained
prior to discontinuing benefits. However, unlike the multiple
IME's in the present case, the IME report in <u>Brennan</u> contained
questionable conclusions and failed to consider Brennan's job
duties. It was not until well after benefits had been
discontinued that the insurer attempted to justify its decision
by bringing in a vocational expert to consider the demands of
Brennan's occupation. <u>See id.</u> at *3.

A genuine and bona fide dispute exists as to whether
plaintiff continued to be totally disabled after June 2, 1998.
The record does not support a finding that Equitable was
vexatious and unreasonable in denying plaintiff's claim on the
ground he could again perform the duties of his occupation. The
§ 155 aspect of plaintiff's claim for relief will be dismissed.

### D. Interference with Contract

As to Unum's and Revere's liability for intentional
interference with contract, Revere contends its conduct was
privileged because it was acting as an agent of Equitable. Unum
contends it is not responsible for the conduct of employees of

its indirect subsidiary, but, even if it is, it would also not be liable because the conduct was privileged.

An agent of a principal is conditionally privileged against a claim that it interfered in a third party's relationship with the principal. Citylink Group, Ltd. v. Hyatt Corp., 313 Ill. App. 3d 829, 729 N.E.2d 869, 877 (1st Dist. 2000); Stafford v. Puro, 63 F.3d 1436, 1441 (7th Cir. 1995); Stanford v. Kraft Foods, Inc., 88 F. Supp. 2d 854, 856 (N.D. Ill. 1999); Roy v. Austin Co., 1996 WL 599435 *10 (N.D. Ill. Oct. 16, 1996). To overcome the privilege, it must be shown that the agent's conduct was malicious and unjustified, which generally requires a showing that the agent acted in its own interests and contrary to the interests of its principal, or that it engaged in conduct totally unrelated or antagonistic to the interest giving rise to the privilege. See Citylink, 729 N.E.2d at 877; Storm & Associates, Ltd. v. Cuculich, 298 Ill. App. 3d 1040, 700 N.E.2d 202, 209 (1st Dist. 1998); Stafford, 63 F.3d at 1441; Stanford, 88 F. Supp. 2d at 856; Naeemullah v. Citicorp Services, Inc., 78 F. Supp. 2d 783, 793 (N.D. Ill. 1999); Roy, 1996 WL 599435 at *10.

Unum's contention that it cannot be held liable based on being a parent of Revere need not be considered because it is undisputed that a number of the people processing plaintiff's claim on Revere's behalf were actually employees of Unum or its predecessor corporation, Provident Companies, Inc. Therefore, Unum's liability would be direct, not through its subsidiary.

The undisputed facts in this case also show that, pursuant to the Agreement, Revere (including the Unum employees it utilized) was acting as Equitable's agent in processing plaintiff's claim. Therefore, the conduct of Revere and Unum was conditionally privileged as to the processing of plaintiff's claim.

Plaintiff points to no evidence that the Revere or Unum employees who discontinued or recommended discontinuing plaintiff's benefits acted in their own interests or outside the scope of their agency. They were processing claims under the Agreement between Revere and Equitable, acting pursuant to the interests of Equitable in processing claims. Plaintiff does not otherwise show that their conduct was malicious in a manner that would overcome the conditional privilege from being liable for tortious interference with plaintiff's Policy with Equitable. The intentional interference with contract claim will be dismissed and Revere and Equitable will be dismissed from this action.[14]

IT IS THEREFORE ORDERED that defendants' motion to deem as admitted defendants' Local Rule 56.1 joint statement of material facts [55-1] is granted in part and denied in part. Defendants Paul Revere Life Insurance Company's and UnumProvident Corporation's motion for summary judgment [45-1] is granted. Defendants Paul Revere Life Insurance Company and UnumProvident Corporation are dismissed from this action and the intentional

---

[14]Within two weeks, the parties shall met (in person or by telephone) to discuss the possibility of settlement.

interference with contract claim is dismissed.  Defendant The
Equitable Life Assurance Society of the United States' motion for
summary judgment [46-1] is granted in part and denied in part.
Plaintiff's prayer for statutory penalties under 215 ILCS 5/155
is dismissed and plaintiff's prayer for future damages is
dismissed without prejudice.  In open court on July 17, 2002 at
11:00 a.m., the remaining parties shall present an original and
one copy of a final pretrial order in full compliance with Local
Rule 16.1 and Local Rule Form 16.1.1.

ENTER:

_____
UNITED STATES DISTRICT JUDGE

DATED:  MAY 30 , 2002